# COURT OF ERRORS AND APPEALS.

## JUNE TERM.

## 1875.

GEORGE F. BRADY, HENRY BRADY, SAMUEL BRADY, and WILLIAM BRADY, trading as GEORGE F. BRADY & CO., defendants below, plaintiffs in error, *v.* WILLIAM H. JEFFERSON, trading as E. JEFFERSON & SON, plaintiff below, defendant in error.

The owners of a steam-tug, who have the exclusive right and privilege by agreement with the canal company of towing vessels and canal-boats or barges by steam-tugs or by mules or horses, on the Chesapeake and Delaware Canal, with a number of barges in tow in a single line astern of it in the canal, is liable to the owner of a cargo of Indian corn on board a sloop at the same time being towed by them with mules through it in the opposite direction, for a collision of one of the barges with it, by which it was sunk and the corn greatly damaged, if the evidence shows a want of special care, diligence and skill on the part of their commander of the steam-tug on the occasion, and no contributory negligence appears on the part of the commander of the sloop, notwithstanding the evidence also showed that the owners of the barge had their own crew on board of it, whose duty it was to attend to the steering of it and to keep it in the wake of the steam-tug and in the line of the rest of the tow behind her, but not one of whom was above the deck or at the helm of it when the collision occurred.

THIS case came up in the Court of Errors and Appeals on a writ of error and bill of exceptions filed to the Superior Court for New Castle County, and was heard before Saulsbury, Chancellor, Gilpin, Chief Justice, Wootten, Houston, and Wales, Associate Judges, in which the case was tried before Wootten and Houston, Judges, in the absence of Gilpin, Chief Justice, in the court below.

60

The case below was an action on the case for negligence in the steering and management of a line of four barges in tow of a steam-tug belonging to the plaintiffs in error on the Chesapeake and Delaware Canal, in consequence of which the last, or last but one, of the barges in the line came in collision with a sloop laden with a cargo of Indian corn belonging to the defendants in error and sunk her and her cargo in the canal. On the trial the plaintiffs below, defendants in error, had a verdict for the damages sustained, and upon a bill of exceptions filed by the plaintiffs in error, defendants below, to the charge of the court to the jury on the facts proved, the writ of error was taken to this court. *Vide Jefferson* v. *Brady & Co.*, 4 *Houst.* 626.

The grounds of error assigned were that on the trial of the case below the defendants in the action proved by several witnesses of long experience in and full knowledge of the mode of conducting the business of towing barges and vessels through the Chesapeake and Delaware Canal, and of navigating the same, and of the usages and customs connected therewith, that barges and other vessels entering it and taking steam or mule or horse towage always continued in the custody, possession, and management of their respective crews, whose invariable duty it was to steer such barge or vessel whilst being towed through it whether by steam power or by mules or horses, and keep watch over the same to avoid collision with other barges and vessels, for which they were paid as a part of their usual employment by the owner or owners of such barge or vessel, and who were not paid, appointed, or discharged by the proprietors or the officers of the tug-boat engaged in towing it; and that whilst a steam-tug having a line of barges in tow has control over them, so far as going ahead or slacking speed is concerned, it is at all times in the power of the helmsman of any barge or vessel whilst being towed to steer it in such a manner as to collide with another in meeting and passing it, and that such a collision may be produced by his steering such barge or vessel willfully, or by his neglecting to steer it properly on such an occasion. That every such barge or vessel is usually and should always be provided with a horn to signal the steam-tug to stop or move as the occasion may require, and that it is the

duty of the persons in charge of the tug to heed and obey such signal by horn or by passing the word along from barge to barge or vessel to vessel in tow from it; but the steam-tug otherwise always dictates and regulates her own speed and the speed of the barges or vessels in tow, subject to the rules and regulations of the canal company. No sudden instance, however, of careless or intentional bad steering of a barge or vessel in tow and under way can be immediately checked or remedied by anything which can be done by or on board of the steam-tug.

That the steam-tug on the occasion in question was in command of a licensed first-class pilot and an experienced commander of steamboats, and that it was well found and fitted for its work, and that the engineer and fireman of it were also experienced and competent men in their respective capacities; that it had in tow in the canal four empty barges in a line astern of it attached to it and to each other by tow lines the usual distances apart, each having on board its usual and proper crew, when it met the sloop a few hundred yards on the easterly side of the bridge of the Delaware Railroad Company over the canal, and that when the tug was about three hundred yards from the bridge and approaching it, the commander, who was then at the wheel of it, rang " one bell," the signal to slacken the speed of it, and was at that instant apprised by the engineer that the two rear barges in tow were not steering properly, and immediately blew the steam whistle of it three times, which was the signal to call the attention of the several crews forthwith to the proper steering of their respective barges, which they heard, but the steam escaping and the smoke blowing from the smoke stack of the tug between his position on the forward part of the tug and the barges behind it, he did not see or know of the collision, but then, receiving a signal from the barges that all was right, he went ahead. The sloop, however, was in motion all the time he saw her. The engineer corroborated the testimony of the captain of the tug, and added that he was so situated that he distinctly saw the collision, and that it was between the sloop and the fourth or last barge in the line, and was caused by the barge not being properly steered and by the sloop not being properly tied up to the tow-path whilst the tug and its tow

were meeting and passing it, and it was consequently allowed to sheer out into the canal and strike the barge, but that nothing could have been done on board of the tug which could have prevented it. And further, that the barges were fastened in tow of the tug as follows: The first barge by two lines to the tug and about twenty feet astern of it, the second barge by one line to the first and ten or twelve feet astern of it, the third barge in like manner to the second and ten or twelve feet astern of it, and the fourth in like manner to the third and the like distance astern of it, none but the first being directly attached to the tug. And further to maintain the issue on their side, the said defendants below proved and offered in evidence before the jury the printed regulations of the canal company required to be observed by all vessels navigating the canal and which were then set forth at full length, one of which was that steamboats shall always give the inner track or the side of the canal next to the tow-path to vessels and boats in tow of horses. By the agreement of counsel the statement of the facts of this case, as reported in *Jefferson* v. *Brady & Co.*, 4 *Houst.* 627, 8, 9, was to be read as part of the bill of exceptions at the hearing of this cause, and which was as follows:

Action on the case for damage to a cargo of Indian corn belonging to the plaintiff sunk in a sloop by collision with a barge in tow of a steam tug-boat of the defendants on the Chesapeake and Delaware Canal in the month of March, 1873, before Wootten and Houston, Judges, Gilpin, C. J., absent. The defendants had by contract with the canal company the exclusive right and privilege of towing all vessels on the canal both by steam-tugs and by horses or mules, except such as were propelled by steam or were provided with horses or mules of their own to tow them. At the time of the collision, the sloop with the cargo of corn on board, consisting of about sixteen hundred bushels, was proceeding, drawn by a mule team belonging to the defendants and a driver of it in their employ, from Bohemia on the canal eastward through it to New Castle, when on rounding the curve to the west of and near the Delaware Railroad bridge, and when within a hundred yards of it on the western side, the steam-tug was suddenly discovered to be approaching it at full speed

from the opposite direction and only five or six hundred yards from it, but not in time for the sloop to be stopped before running into the bridge had the attempt been made to do it; and accordingly, the proper signal having been promptly given on board of the sloop for the removal of the draw of the bridge, which is not of sufficient width to admit two vessels abreast into it, and which was as promptly done by the keeper of it, the sloop was immediately passed through the draw, when the order was given by the captain of her to the driver of the team to cast off the tow line, and as soon as the sloop was clear of the fenders of the draw on the other side she was sheered close in toward the bank of the canal and the tow-path, the steam-tug then being about two hundred yards from the bridge.    The tug had in tow astern of her four empty barges or canal boats bound through the canal to the city of Baltimore, attached to it in a row or single line coupled together in the usual method and with the usual lengths of tow-lines between them.    As soon as the sloop cleared the draw of the bridge the captain of it discovered the barges in tow of the tug, and that there was no one on the deck or at the tiller of either of the third or fourth one in the line, and that they were both veering or yawing very much from the course of the tug toward his side of the canal, and to avoid a collision with them he run the sloop as hard aground as he could on his side of the canal and as close to the tow-path as practicable, about a hundred and fifty yards from the bridge.    It was also observed about the same time by the captain of the tug that there was no one steering either of the two hindmost barges, and he at once gave the signal from it for the men on the barges to steer them, but before any one had appeared on deck and reached the tiller of either of them the bow of the third barge came in contact with the bow of the sloop, partly between it and the bank of the canal, carrying away the bowsprit and splitting her bows open down the stem from the deck to her keel nearly, and, dragging her round with her head toward the middle of the canal, sunk her beneath the water of it.    In the meanwhile the engine of the tug had been stopped just after it had passed the sloop, which was grounded immediately afterward by the captain of it.    There was a strong wind blowing at the

time from the northeast and partly across the canal and from the side of it on which the sloop was grounded. The barges in tow belonged to unknown and different persons living out of the State and were all manned by crews employed and paid by the respective owners of them.

There was considerable discrepancy and even conflict in the testimony of the witnesses, as is usually the case in collision of vessels, but the facts as above stated were substantially established without any material contrariety in the evidence adduced on behalf of the respective parties. It further appeared also in the evidence that there is what is termed by the men in the business a suction of the water produced in the canal by the passage of a steam-tug or by any other vessel drawing as much water and propelled in like manner through it, which has the effect both to lift and draw a vessel from the sides of the canal into the wake of it immediately after passing it; and so well was that fact and the force and danger of it known to men as familiar with the navigation of the canal as was the captain then in command of the sloop, that the captains of vessels towed as the sloop was when meeting a steam-tug frequently stop and make them fast with their lines to the side or bank of the canal until they pass in order to prevent and escape it, and that the most prudent captains generally adopt this precaution to avoid the danger of it when they have sufficient notice and time to do so on such occasions; also that there are snubbing posts set in the bank on that side of the canal from the bridge up to near where the sloop was grounded which afford peculiar facilities for that purpose. By the regulations of the canal company a tow drawn by horses or mules is required to keep on the side of the canal next to the bank on which the tow-path lies and as close to it as practicable, and steamboats are always required to give the inner track to such a tow.

Whereupon the said defendants by their counsel prayed the opinion and direction of the court to the jury, first, that the said steam-tug stood in the relation of a bailee for hire to the said barges and every one of them in her tow, and was to be held only to the exercise of ordinary careful management in the towing of them; second, that no increased care or responsibility

could be demanded of the tug toward other vessels or barges she might meet in the canal than was due from her toward her own tow; third, that if no negligence or omission of ordinary care and management was proven on the part of the said tug, then the tug or her owners were not responsible either to the barge or barges in her tow or to the owner of any vessel or cargo injured by a collision with any of the barges in her tow ; and, fourthly, that if something was to be done by the captain and crew on any of the barges in tow of the tug, in steering, keeping watch, and obeying signals, and if there was a want of care or skill in the performance of those duties by the captain and crew of any barge to which the collision that ensued was attributable, then the tug and her owners were not responsible to those who had suffered for want of such care or skill.   The charge of the court to the jury was then stated also at length in the bill of exceptions, the tenor of which will sufficiently appear for the purposes of this case and the report of it from the assignment of errors and the objections taken to it by the plaintiffs in error, which were as follows: that the court had erred in omitting to charge the jury as requested in the first, second, third, and fourth prayers in the bill of exceptions stated ; fifth, in charging the jury that the defendants as owners of the said steam-tug were liable for damages caused by any collision occasioned by negligence and want of ordinary care, skill, and diligence on the part of any person whose duty it was to steer the said barges; sixth, in charging the jury that those who make it a business to tow vessels and barges through this artificial channel of navigation, hold the relation of principals to those who employ them and who are to be held as their agents, and that the law of principal and agent applies to their transactions; seventh, in charging the jury that under the rules and regulations of the canal company, the relations and liabilities of those who make it a business to tow vessels through the canal are to be fixed and settled as being those of a principal to those who employ them, and who are to be held to be their agents in such transactions ; eighth, in charging the jury that the captains and crews of the said barges were the agents of the said tug-boat and her owners for the steering of them when towed by her on the canal.

*Pepper*, for the plaintiffs in error : We have always contended in this case that the owners of the tug were merely bailees of the barges for hire whilst engaged in towing them through the canal, and as such were only bound to exercise ordinary care and skill in towing them to avoid such a collision with any other vessel at the same time being towed upon it.   They were not common carriers of the barges for hire, and were, therefore, not liable for the careful and safe towage of them to that stringent degree which the well-settled principle of law would import, if the relation of a common carrier had existed between the owners of the tug and the owners of the barges in their occupation.   *Story on Bailm.*, sec. 496 ; *Alexander* v. *Green*, 3 *Hill* 1; *Caton* v. *Rumney*, 13 *Wend.* 387.   Nor were the owners of the tug the principals, and the captain and crew of the respective barges in tow their agents or servants to steer the barges for the occasion, that is to say, in their passage through the canal in tow of the tug, for no such relation as that, either in contemplation of law or in point of fact, existed between the owners of the tug and the crews on board of the respective barges during that time, and therefore the owners of the tug were not responsible for any collision or injury which resulted solely from the negligence or the neglect of the crew on any one of the barges to attend properly to the steering of it at the time of its occurrence.   *The Farragut*, 10 *Wall.* 336 ; *The Webb*, 14 *Wall.* 416 ; *The Cayuga*, 16 *Wall.* 177 ; *Sproul* v. *Hemmingway*, 14 *Pick.* 5, 6 ; *Lougher* v. *Pointer*, 12 *E. C. L. R.* 311; *Milligan* v. *Wedge*, 40 *E. C. L. R.* 177 ; *Quarman* v. *Bennett*, 6 *M. & W.* 503.

The crews on the barges were solely the agents and servants of the owners of them respectively, and were solely appointed and paid by the owners of them for the purpose of steering and running them through the canal or elsewhere under whatever kind of tow, and were solely removable from their employment as such by the owner or owners of the barge, and the latter, being their principals or masters in their business and employment of running and steering the barges, they, and not the owners of the tug, were responsible in law for any injury resulting to another from their negligence or want of reasonable care or skill in the steering and running of them wherever that might be.   The

owners of the tug, even for the time being and while under tow by them, could not remove them from their employment on the barges or appoint others to take charge and command of them, and it was equally evident that practically the crew and officers on board of the tug when under way with the barges in tow astern of her could not prevent the latter from yawing, as they term it, from a direct line toward either bank of the canal, and that none but the crews on the barges could prevent it. They and their employers and principals, the owners of the barges, should therefore be held liable for such an injury as this, when it is clearly attributable to their negligence alone, as is admitted in this case.

The contract between the owners of the tug and the canal company to do the general towing on the canal upon such terms and conditions and at such rates as the company see proper to prescribe, is not a monopoly, any more than the company itself is, and, of course, it would not long continue if the company did not find their compensation, advantages, and profit in it by thus being relieved of the trouble and expense of doing the towing itself on the canal; but if it had to incur the expense of furnishing the canal with all the appliances necessary for that purpose, the teams, drivers, and tugs, so as to be ready at all times to meet the demands upon them for towing vessels through the canal, they would doubtless find it a losing business to throw it open to free competition, whilst that free competition would soon have the effect probably to render means and facilities of towing on it too precarious and uncertain to be depended on, and thus the public, as well as the company, would become the losers by it. The plaintiffs in error, therefore, were not monopolists in the business in the odious sense of that term, but had assumed an onerous and responsible duty and obligation to be prepared at all times to do all the general towing on the canal at just and reasonable rates, not dictated or fixed by themselves, but agreed on between them and the company. There was then nothing in the fact that they had such an exclusive contract to do the towing for the company which ought to render them liable for such a collision, if they would not be liable in law for it without such a contract.

*Whitely*, for the defendants in error : This was not only a case of first impression in this State, but elsewhere, as far as he had been able to learn, the distinction between it and all the other cases of collision referred to, consisting in the fact that all the others were on navigable rivers or in bays or harbors, in regard to which different rulings were to be found in the different States, while this occurred in an artificial channel of water communication, the Chesapeake and Delaware Canal, between an empty canal barge in tow with three others in a line astern of a steam-tug, and a sloop laden with corn towed by a team of mules proceeding in an opposite direction, both at the time in the possession, care and custody of the same towing company for the purpose of being safely towed through it, accompanied with the fact that neither of them was at liberty to employ any other person to perform that service for them; in case they were not provided with motive power of their own to perform their own towing. There was also another special fact or circumstance which should be mentioned in connection with it, and that was that each of the four barges tied together and constituting the tow of the tug belonged to different owners residing in different and remote parts of the country and beyond the limits of this State, whilst the plaintiffs in error resided almost within sight of the canal, and each barge was manned with a crew appointed and employed by the respective owners of them. The evidence in the case was clear and uncontradicted that no one was at the rudder of either the third or the fourth barge in the line, and no one was steering either of them just before and at the time when the collision occurred. The barges being thus obliged to employ the tug, and being under the command of its captain and in the possession, custody and control of the owners of it, as bailees for hire of the barges, according to the admission on the other side, for the time being, and for the purpose of being towed by them by means of their tug through the canal without damage to them, or the property of the company, or the property of any person rightfully on the canal so far as it could be avoided by the exercise of due care, skill and diligence, the law would necessarily imply that they were for the time responsible for any injury to the property of another rightfully on the canal, and particularly,

when it was at the same time and in a similar manner and for a like purpose also in their possession, care and custody as bailees for hire of it, which might result from the neglect of the crew on board of any one of the barges to attend properly to the steering of it when under way and being towed by the tug, and particularly, while meeting and passing another vessel in such a channel, and where such a mode of navigating it by steam-tugs with long lines of barges towed astern of them, is peculiarly liable to produce such collisions. The crews, it is true, on board of the barges were appointed, employed and paid, and could only be discharged and removed from them, by the owners of them, for the owners of the tug or its captain, we may admit, possessed no such general power or authority over them. But it is for their interest as well as for the interest of the owners of them, and, in point of fact, it is absolutely necessary, that they should continue as crews on board of them in their passage under tow through the canal, and as such crews on board of them, it is a duty which they owe alike to the owners of them and to the owners of the tug and the captain or officer in command of it, to steer and properly attend to their barges to keep them in a proper course as much as possible while under tow ; and such had been the uniform custom, practice, and understanding by all concerned in the matter ever since it was opened to this kind of navigation.

As soon as the barges are made fast to the tug and the towing is begun each captain and crew of the barges understand that to be their duty, and from that moment that they are under the command and authority and subject to the orders and directions of the tug and its captain in all that pertains to the navigation and towing of them so long as it lasts on the canal, and for that purpose established signals are given and received from the tug and are obeyed on board of the barges. And such also is the law and the regulation of the canal company on the subject, for it is one of the requirements of the owners of the tug, made, of course, with the sanction and the approval of the company whose agents and representatives they are in their business, that the captain and crew of every barge shall faithfully attend to and properly steer their barges while in tow and under way, so as to save themselves as well as other vessels from any injury or ob-

struction in the passage of the canal. And does not the fact that
the barges by reason of the exclusive contract between the com-
pany and the owners of the tug for all general towing on the
canal, imply or import and impose in law a stronger obligation
than usual upon the latter to see that every barge in tow in such
a critical emergency is steered and handled with the utmost care
and skill by the crews on board of them? If, then, the owners
of the tug were the bailees of the barges to tow them through
the canal, and the several crews on board of the respective barges
were under their command and subject to their orders and direc-
tions as given through the captain of their tug, and were engaged
in aiding and assisting and serving them in towing the barges
in the way and to the extent before mentioned, would it not
constitute and establish in contemplation of law the relation of
principals and agents between the owners of the tug and the
crews of the barges in their mutual and relative connections with
that undertaking, which would render the former liable as prin-
cipals for any damage resulting to the property of a third
person from the culpable negligence of the latter as their agents
or servants in steering the barges while so under tow? But let
us vary the case and suppose that by a similar collision on the
canal the barge instead of the sloop had been sunk by reason of
the culpable negligence of the captain and crew of the tug, would
not the owners of the tug have been legally liable to the owners
of the barge for the damage occasioned by it?

Such was the view which the court below took of the law of
the case, and such was the legal relation which then existed
between the owners of the tug and the crews of the barges ac-
cording to the charge of the court to the jury on that question.
And the court was correct in so charging them. 1 *Pars. on
Ship. & Adm.* 534, and *note* 3; *The John Counter* v. *Adm. Court,
Lower Canada,* 18 *Law Rep.* 553. Numerous cases had been
cited on the other side, but they were all cases of collisions on
rivers or in bays and harbors and in admiralty, and where a
single ship was in tow of a tug; and yet, in all those cases
where it was found that the ship was under the control of the
tug, the tug was held liable for her collision. *Steamer Express,*
1 *Blatchf.* 365; *Ship John Frazer,* 21 *How.* 184; *Sturgis* v.

*Bowyer,* 24 *How.* 110. And in such cases it had also been ruled that where a vessel is at a wharf or aground in a river or harbor a tug approaching it with a tow must proceed with great care and caution. *Granite State,* 3 *Wall.* 310 ; *The Syracuse,* 12 *Wall.* 167. The case of *Sproul* v. *Hemmingway,* 1 *Pick.* 1, had been cited and was much relied on by the other side, but there was nothing in the ruling nor in the remarks of Shaw, C. J., in announcing the decision of the court in that case, which was inconsistent with the opinion of the court below in this case when it was properly weighed and considered with all the facts which appeared in it. Besides, it was the case of the collision of a brig in tow of a steamer with a ship at anchor in the Mississippi River, below New Orleans, by the default of the captain and crew of the towing steamer, and for which the owner of the brig was sued by the owner of the ship in the court in Massachusetts, and the only question before the court was whether he was liable for the collision, and it was very properly held that he was not, and all that was said beyond that hypothetically was extrajudicial.

But if the crews on the barges were not under the command and direction of the captain of the tug during the time they were towed by it, and were not for the occasion the agents or servants of the owners of it to co-operate in the proper towing of them by steering them, then there was no superior will, no master or no commander, to lead and direct the towing of them, and as there were no less than five distinct captains and crews engaged together in the undertaking, this would involve such a practical absurdity that no one could suppose that such a thing could ever have been for a moment contemplated by any one engaged or concerned in it. The entire business of the canal must become a failure if it is to be understood that such is the law, and such are the legal relations which exist between them. The business of the tug is to start the tow, to direct its course, draw it forward, to regulate its speed, or stop its motion as occasion may require, while that of the helmsman of each barge in the tow is to so steer it as to keep it as much in the wake and course of the tug as practicable, as they thus tow to better advantage so far as the tug is concerned, and with greater

security to the barges as well as other vessels in the canal, and the works of the canal company also. And it is a duty which they owe to the tug and its proprietors to steer them carefully and skillfully, and it is not only in the power and authority of the latter to require them to do this, but it is also their duty to all concerned to see that they do it. And it is the duty of the tug when meeting another vessel, either to give it so wide a berth or to go so slow that, either a collision cannot occur or if it does, it will be attended with no injury to either vessel. It was conceded by the counsel on the other side that if the tug itself, instead of one of the barges from a like neglect had collided with the sloop, the owners of the tug would have been liable for the damages, but as it was in this case, they contend that the owners of the colliding barge, and not the owners of the tug were liable for the injury. If, however, as he had shown, he thought, that the tug, her owners and commander, were the bailees of the barges, and the principals or masters in the joint undertaking which brought them together, and for which they had become the bailees of them for the time being, and the captains and crews of the barges were for the time being but their agents or servants to aid and assist them in towing them by attending to the rudders and steering them, and to receiving and obeying signals and giving them when required, then the liability of the proprietors of the tug would and should be the same for a collision between a barge, as between the tug and a vessel belonging to a third person; while the exclusive privilege which the plaintiffs in error have of towing on the canal, and the fact that the owers of the barges, as well as the owners of the sloop and her cargo, were practically obliged to submit to that privilege and to the command and authority which it conferred upon them, should afford a strong additional reason for taking this view of the relation which existed between the owners of the tug and the crews of the barges during the tow, and it should certainly increase rather than diminish the force of the legal obligations and liability which they assumed when they engaged in the undertaking to tow the barges, or have them towed, with all due care and skill toward all persons either directly or indirectly interested in the safe and proper towing of them through the canal.

*T. F. Bayard*, for plaintiffs in error: The question of legal responsibility presented in the case depended upon plain, equitable and practicable principles adapted to all times and occasions, and comprehensive enough to embrace new cases as they arise in the progress of the changes and improvements made in the means of carrying on the trade and commerce of the country, and each case as it arises must be examined and considered with reference to its own peculiar facts before we can correctly apply the principle of legal responsibility which is to control it. The responsibility of the principal for the acts of his agent, under the precept and rule of law, *respondeat superior*, is founded upon the fact that the agent represents him in the act and is employed by him to do it. *Qui facit per alium facit per se ;* and, therefore, in all these cases the question to be considered and properly solved is, who employed the person that did the injury? And when you say whose agent or servant the person was who did the injury, you have solved the question and fixed the legal responsibility for it on his principal or master. And to do this, you must inquire and determine who appointed or employed him, who hired and paid him, who could remove him for misconduct in doing the injury; for such a person only could be his principal or master on the occasion in contemplation of law. *Story on Agency*, secs. 452, 453 ; *Laugher* v. *Pointer*, 12 *E. C. L. R.* 312; *Quarman* v. *Burnett*, 6 *M. & W.* 503; *Sturgis* v. *Boyer*, 24 *How.* 122 ; *Milligan* v. *Wedge*, 40 *E. C. L. R.* 177. And Shaw, Chief Justice, tests the question as to the relation of master and servant in the same way in *Sproul* v. *Hemmingway*, 14 *Pick.* 5. The testimony in the case and stated in the bill of exceptions shows that each of the barges was required to have, and did have, a captain and crew of its own on board when it entered the canal, and in whose custody and possession it was during the time they were passing through it and afterward, who were employed and placed on board of it and hired and paid for as such by the respective owners of them, and who could only be removed or discharged from their employment on board of any one of them for any cause whatever by the owner or owners of it; whilst the proprietors of the tug were entire strangers to them, had no contract with them, did not hire or

employ them, were to pay them no wages, and had no power to remove or discharge them, or to appoint others to take charge of it. Each of the crews were therefore to remain on board of their respective barges and continue in charge of them during their passage through the canal, the same as before they entered it and would after they should leave it, both by the requirement of their employers, the owners of the barges, and by the expectation of the owners of the tug, the towing company.

And what was the legal relation between the tug and the barges? Each barge having its own crew and master on board and in charge of it, and needing simply towage, or the accessory power, as it is termed by Clifford, J., in *Sturgis* v. *Boyer*, to draw it through the canal, the business and duty of the tug was to furnish the motive power for that purpose merely, and to draw it through the canal with safety both to the barge and to the property of all others rightfully on the canal including that of the company, so far as it depended on the exercise of due care and skill by the captain and crew of the tug on their part in the towing of it, while the business and duty of the master and crew of each of the barges was to attend with due care and skill to the rudder and the steering of it, so as to keep it in its proper course and directly in the wake and course of the tug as far as practicable, and to attend to and obey signs and signals from the tug given for their direction, and which was a business and duty that could not possibly be attended to or performed by the tug, its master and crew, or by any other person or persons but the master and crew on board of each of the barges. Their respective duties, therefore, though relative and mutual on the occasion, were as absolutely separate and distinct and peculiar to each, as if there had in fact been no union or connection between them for the time being. The barge was not delivered over to those in charge of the tug as a passive article of goods merely, as in cases of ordinary bailment, to be carried to its destination, but remained in the custody and charge solely and exclusively of its own master and crew, so far as the safe and proper towing of it, depending on the safe and proper steering of it, was involved or concerned in the undertaking. The good or bad steering of it on the occasion necessarily de-

pended wholly and solely upon the care or negligence of its own captain and crew, and in no degree whatever on that of the captain and crew of the tug.

It was, of course, equally the duty of both crews to exercise proper care, skill and diligence within the appropriate sphere and power of each in the towing of the barge, but where their appropriate and respective parts and duties to be performed in the undertaking were necessarily in the very nature of the thing to be done jointly by them, so entirely separately and distinct that the one could not possibly perform that of the other, it would be as unlawful as it would be unjust to hold the one who had been guilty of no laches, neglect, or negligence whatever, to answer for the negligence or default of the other, particularly while standing in the peculiar relations in which these two classes of servants stood to their respective masters and employers and to all other persons concerned in the matter. And the relative and mutual duties and responsibilities, and the measure of the respective liabilities of a steam-tug and vessels in tow are so stated and recognized in the cases of *The Julia,* 1 *Lush.* 231 ; *Gray* v. *Frazer,* 21 *How.*193 ; *Sturgis* v. *Boyer,* 24 *How.* 123 ; *The Cayuga,* 16 *Wall.* 177 ; *The Steamer Webb,* 14 *Wall.* 416 ; *The Farragut,* 10 *Wall.* 336 ; *Ang. on Carr.,* secs. 668, 60 ; *The Duke of Sussex,* 1 *Wm. Robin.* 270. In this case and upon the distinction ruled or recognized in the cases just cited, the tug and her proprietors were not responsible for the collision, but the barge and its owners were liable for it, if it was occasioned solely by the neglect of the master and crew to steer it when it occurred. It should also be observed that there was no rule or regulation of the canal company in regard to the navigation of it which confers any power on captains of tugs over barges or the crews on board of them while having them in tow, and the utmost it seems they have the power or authority to do is to cut them loose and let them go for a neglect of duty or a disobedience of orders or neglect of signals given, but which, if it had been or could have been done in this case without cutting all the barges loose, by severing the tow-lines of the first one, which were the only lines that connected the whole of them with the tug, would have been of no avail under the circumstances to prevent the collision, for the mere

momentum of the tow and the barge in question would have then produced it had the barges been instantly severed from the tug.    And there was no pretension that the tug, the captain, crew, or owners of it, had violated or infringed in any manner or degree any regulation of the company in relation to the matter. *Pars. on Ship. and Adm.* 536. And the rules of the company so far as applicable to it constitute a part of the case. *Story on Bailm.*, sec. 496 ; *Alexander* v. *Green*, 3 *Hill* 19.    It would be competent for the canal company doubtless to provide some needed rules in this respect to supply the omission and remedy injuries of this kind, but none have ever been prescribed.

*Gilpin, Chief Justice,* delivered the opinion of the court: It is to be observed at the outset that this is not a case between the steam-tug " Swallow " and the colliding barge towed by her.    The question presented by this controversy, and which we are called upon to decide, arises between the owners of the tug Swallow, then having four barges in tow, and a third party, namely, the owner of a cargo of corn on board of the sloop Helen, then being towed by the plaintiffs by mule power, which was sunk in the Chesapeake and Delaware canal and damaged by reason of a collision between one of the barges then in tow and the Helen.    The question of contributory negligence on the part of the Helen was properly and distinctly submitted to the jury on the trial below, and they by their verdict found in effect that the Helen was without fault as touching the collision.  And thus we are confronted with the question as to who should be held to be legally responsible for the sinking and damage of the cargo of corn—the owners of the tug or the owner of the colliding barge.    There certainly was fault somewhere, for which somebody is answerable.    Upon whom then does the fault and reponsibility rest ?    The plaintiffs in error contend that they were without fault ; and that the injury sustained by the defendant in error is solely attributable to the fault of the colliding barge ; that the plaintiffs in error, as well in fact as in law, stood in the relation of mere agents of the barge, and are not responsible in that character for the injury.    In other words, they say they were not guilty of any negligence—that the tug was the

agent and the barge the principal in the transaction; and that the injury was caused by the negligence of the latter, for which they are in no way responsible. Such I understand to be the position of the counsel for the plaintiffs in error. If they are right in their view of the case then it would seem to follow as a logical result that the defendant in error is without remedy as against the owners of the tug. The proper solution of these questions must finally dispose of this case.

It becomes necessary, therefore, for us to ascertain and determine according to the rules and principles of law applicable to the case which of these parties is to be considered the principal and responsible party in this transaction. It appears by the record before us that the plaintiff in error had the exclusive right and privilege of towing all vessels on the canal both by steam-tugs and by horses or mules, except such as were propelled by steam or were provided with horses or mules of their own to tow them. With these exceptions they enjoyed by contract with the canal company the exclusive right and privilege of towing all vessels in and through the canal. It follows, therefore, that such as had not the means of propelling their own vessels were of necessity compelled to employ the plaintiffs in error for this purpose. The barges in question were utterly destitute of all means of propulsion. The tug at the time of collision had the four barges in tow, each belonging to different persons, and each having a separate and independent commander on board, and those barges attached to each other and to the tug, but each having an independent commander, were being carried through the canal.

Now, under these circumstances, with what show of reason, in view of the facts, can it be contended that the several barges stood in the relation of principals to the tug, and that the latter was subordinated to and hence subject to the direction and control of the several commanders of the different barges? In this view of the case there would be four separate and independent commanders differing perhaps in their opinions and in their directions to the tug. Is it to be supposed for a moment that the business of towing could be safely carried on under such circumstances? It seems to me that the exigencies of the business

and its safe prosecution require that the authority to direct and control should be a unit and should reside with the steam-tug. The four barges were attached together and to the tug by hawsers or lines—the first by two lines about twenty feet astern of the tug, the second by one line to the first barge ten or twelve feet astern of her, and the third and fourth barges attached in like manner and distances from each other. As heretofore remarked, the barges had no motive power of their own. Whatever motion they had was imparted to them by the tug. The barges and tug attached together, as above described, were substantially and in effect one combined moving mass whose momentum was the result of the tug's motive power acting on both the tug and the barges. It would seem to be manifest, therefore, that the navigation of the barges was dependent upon and controlled by the navigation of the tug.

The business of towing vessels by steam power, although of comparative modern date, has grown to be an important and extensive branch of business in most of the harbors, rivers, and canals of the country. The power of the tug over the course and navigation of the tow is practically paramount and controlling, and hence it follows that a corresponding responsibility should attach to her for any injury which may have happened to innocent third parties from collision with the tow in her charge. And especially must this be so where the tug herself is in fault in not using *proper timely precaution* in guarding the tow against the danger of injury to third parties being committed by her. As the business of towing by steam power has in fact become a specialty, the words "ordinary diligence, care, and skill" do not sufficiently indicate and define the *measure of duty* required of the commander of a steam-tug engaged in this business. It is something more than ordinary. A person who is called upon without any special qualifications to perform a particular service is expected to apply only such care and diligence as is usually bestowed by persons of ordinary common sense. But a specialist engaged in his specialty is bound to exercise special care and diligence. The distinction is not merely nominal, it is real, and challenges the approval of reason and common sense. The law recognizes it as a just and proper distinction.

The duty which the commander of a steam-tug engaged in the business of towing assumes to perform, requires of him by reason of its being his specialty a higher degree of caution, diligence and skill ; not merely the diligence of an ordinary person or non-specialist, but the diligence and skill of a good business man in his particular specialty. And the skill and diligence required must be commensurate with the duty to be performed, and the measure of the care and timely precaution to be exercised must rise in proportion to the dangers of the service.

The founders of the ancient common law never so much as dreamed that steam would ever be applied as a motive power in the propulsion of vessels, and, of course, they could not have anticipated its use in the business of towing. But it is justly claimed as indicating the practical wisdom and advantages of the common law, as illustrated by the current of judicial decisions from the time of Lord Mansfield up to the present day, that it adapts itself to the manifold and varying necessities of commerce as they from time to time arise in the progressive development of the business of the country. And considering this to be so it seems to me that it would be a reproach to our system of jurisprudence, if an adequate remedy could not be found in a case like this where no remedy can be had in admiralty in consequence of the injury having occurred in the waters of a canal. The question to be determined should always be who was in fault in the particular case.

Considering, as I do, that the barges and their crews were for the time being subordinated to and under the direction and control of the tug and her commander, I am of opinion that there exists no error in the charge of the court below. But even apart from the doctrine of *respondent superior*, I am of opinion that the tug was in fault, or, in other words, was guilty of negligence. The commander of the tug was bound to know and to guard against the dangers of the navigation. It was incumbent upon him, as matter of duty, to know there were bridges to pass through, that vessels were almost constantly passing each other in their transit through the canal, that the natural and uniform effect of the tug moving through the water at her usual rate of speed would be to lift and draw a vessel from the side of the

canal into the wake of the tug; and therefore he was bound by timely forecast and precaution to guard against such a result, especially in a case like this, where he had a string of four barges in tow behind him, occupying a space of several hundred feet in the rear of the tug. He, of course, knew of the curve in the canal on the westerly side of the bridge, and that the tug was liable to be suddenly approached by vessels from that direction; and it was his duty to keep a sharp lookout for them, and to sufficiently slacken the speed of the tug, or, if need be, to stop her altogether, in order to avoid the danger of collision. If he had done either the one or the other when he first saw the Helen approaching, the collision would in all human probability have been avoided. But, instead of doing this, he kept right on, only slightly slackening her speed, until after the tug and two of the barges had passed the Helen.

In view of all the facts disclosed by the record I do not think he used that timely care, forecast, and precaution which the circumstances of the case and the law, as I understand it, demanded of him, and hence that he was guilty of negligence.

In addition to the authorities cited in the course of the argument by counsel on both sides, I would refer to the following cases of *The Express*, 1 *Black. C. C. R.* 365; *The Syracuse*, 12 *Wall.* 167; *The John Counter*, 18 *Law Reporter* 553; *The R. W. Forbes*, 19 *Law Reporter* 544; *The Lady Pike*, 21 *Wall.* 1; *The Mohler*, 21 *Wall.* 230; *Wharton on Negligence, secs.* 32, 33, 947.

The judgment below is affirmed.

*Saulsbury*, Chancellor, dissented on the grounds assigned in the following opinion by him. He said his opinion would be confined to the causes of error assigned which related to that portion of the charge to the jury by the court below and which declared that the owners of the several barges for the time being, and for the purposes of transportation on the occasion in question, were the agents and subordinates of, and under the control and direction of the tug's commander, and that the owners of the tug being the principal, and the owners of the barges being their agents or subordinates, were liable to the plaintiffs below, pro-

vided the collision was occasioned by negligence or want of ordinary care, skill and diligence on the part of any person whose duty it was to steer the barges.    The persons whose duty it was to steer the barges were the persons in and upon the barges, and they were the same persons who were on them before and at the time when the commander of the tug assumed the duty of towing them through the canal, and they continued on them while the barges were being towed through it, and it was the duty of the commander of the tug to tow the barges with those persons who constituted their crews upon them.    He had no authority to displace them and to supply their places as steersmen with other persons.    They were the employees of the owners of the barges and were entitled to receive pay from them while passing through the canal in like manner as when passing over the Delaware or Chesapeake Bay.    They were not employed in any manner by the owners or the commander of the tug.    They could not, therefore, have been responsible for their misconduct to the owners of the tug.    Under these circumstances it is not in my opinion reasonable to consider them or the owners of the barges the agents or subordinates of the owners of the tug, or to consider the owners of the tug their principal in any sense whatever.    There was no element of agency or of principal and agent in the relation which existed between the owners or the commander of the tug and the owners of the barges or the persons on them.

The law in relation to the business of towing vessels is of recent origin.    In my opinion, which, I think, is warranted by the authorities, the contract of the owners of the towing vessel with the owners of the vessel towed, and their obligation to third parties, extended no further than that by no act of those having the towing vessel in charge, willful or negligent, shall the tow or such third party suffer injury or loss.    No man is responsible for an act of commission or negligence which he did not do, command, aid, or assist in doing, or neglect to do, having the power to act to the contrary, or which he could not prevent being done.    The contract of towage does not invest the towing party with the authority to displace the persons on board of the vessel towed, or from the command or management of it, and

imposes no obligation upon them other than to properly tow the vessel, and to give such signs, signals, and directions, and to exercise such careful supervision as to the steering and management of the vessel towed, as may be proper, according to the circumstances as they shall arise.   It is the duty of the persons on board of the vessel towed to steer it as near as may be in the wake of the towing vessel, and to obey all proper signs, signals, and directions of those in command of the towing vessel, and to be in a position to receive these signs and directions, and to exercise due care and diligence in these respects.  They are bound to be at their posts of duty and to perform it faithfully, and if by their omission to do so, those in command of the towing vessels being themselves in no default, if injury or loss thereby results to the towed vessel or a collision occurs with another vessel and injury or loss thereby results to a third party, the owners of the towing vessel are not chargeable, but the owners of the vessel towed must in the one case suffer the loss and injury, it being occasioned by their own act or by the act of those in their own employ, and in the other case for a like reason they must answer in damages to such third party.

It was the duty of the commander of the tug in this case to connect it with the barges and to furnish them with the motive power properly directed to pass through the canal.  If he did that, and performed those other acts of duty and careful supervision which I have named, his whole duty was fully discharged.  If it be said that he might have refused to tow the barges through the canal in case the men whose duty it was to steer them persisted in neglecting that duty, and because he did not do so, but undertook to tow them nothwithstanding their neglect, he thereby made himself responsible for their negligence, it must be shown and not assumed that such a responsibility is imposed by a contract of towage.  No authority has or can in my opinion be shown establishing that principle.  Some weight seems to have been given in the argument, and even in the opinion of the court below, to the circumstance that the Bradys had a contract with the canal company securing to them the exclusive right of towing vessels through the canal.  It may be improper on the part of the canal company to enter into such a contract, and if by

doing so those having a right to pass through the canal shall be delayed, suffer inconvenience, or be deprived of proper facilities for passing through it, the company may by such act become liable in damages to such persons, but this would not change the law or increase their responsibility in respect to those for whom they tow or in respect to third parties passing through or using the canal.

The argument advanced, that if the owners of the tug are not liable for any damage done the sloop in this case by reason of the neglect and negligence of those on board of the barge which collided with it, the owners of the sloop would be without remedy owing to the circumstances that the owners of the barge are unknown and reside out of the State, and no authority existed by which the barge itself could be seized and detained and sold to satisfy such damage, can have no effect in the decision of this cause. We are not to make, but to decide the law. If there be a defect in this respect it arises from the want of legislation on the subject. The court cannot supply the defect. It is not at all uncommon for many barges and for several vessels to be towed at the same time by a single tug or steamer, and to hold that in such a case the tug or steamer or their owners should be liable for the negligence of every crew and helmsman on board of each barge or vessel composing such a tow, on the principle that each of the persons so employed on board of them and each of them, were for the time being and for the purpose of the towing of them the agents or servants of the owners of the tug or steamer would work the destruction of the towing business. This result is not suggested for the purpose of showing what the law is, but that my interpretation of it is more reasonable than the contrary interpretation of it.

In the courts exercising admiralty jurisdiction, where both the towing vessel and the vessel towed are in default, and injury or loss is occasioned by collision with another vessel, they are both liable in damages for it, which are assessed according to the proportion of injury which they have occasioned, or according to the breach of duty of which each has been guilty; but neither in admiralty nor in the common law courts will the towing vessel be held liable for loss or injury occasioned solely

by the vessel towed; nor will the vessel towed or its owners be held liable in damages for loss or injury wholly occasioned by the towing vessel. In the common law courts where loss or injury is occasioned by both the towing and the vessel towed, both are liable for the whole amount of damage done, and in such case there is no apportionment of the damages. The principles which apply to cases of collision on navigable rivers, bays, arms of the sea, and in harbors, in my opinion apply to collisions in canals and other artificial channels of water communication. I find no cases to the contrary. The cases referred to in the note to *Parson on Mercantile Law* do not support the note itself, which seems to recognize a distinction in this respect. I shall now proceed to show that the authorities support the opinions which I have expressed.

In the case of the *Cleadon, Lush.* 13, the court held that the towing and the towed vessel were to be considered as constituting one long steamer for the conduct of which the vessel towed was responsible; that a vessel being so towed in the night time was bound to avoid other vessels, and in such case the motive power was in the towing vessel and the governing power in the vessel towed; and the authority of which was recognized in the case of the *Arthur Gordon, Lush.* 14, and in subsequent cases in the courts of England. And if such was the correct doctrine and it was applicable to towing generally, the principle he had stated in reference to the liability in the present case would seem to be strengthened rather than weakened by it. In the case of the *John Counter*, 18 *Law Rep.* 553, cited in the note to *Pars. on Merc. Law*, which note was read in the argument, the towing steamer was held responsible for damage done to a brig by collision with a barge in tow of the steamer. She was struck by two of the barges in tow of the steamer and the evidence in the case clearly showed that the responsibility for it rested solely on the pilot and the master of the steamer towing them, and in commenting upon it the court in the opinion says: "Cases may occur in which an accident may arise from the fault of the tow without any error or mismanagement on the part of the tug, and in such case the tow alone must be answerable for the consequences." But in that case there was no recognition of the

doctrine of principal and agent as applicable to the owners of the steamer and the men steering the barges. In the case of the *Syracuse*, 12 *Wall*. 171, Mr. Justice Davis in delivering the opinion of the court says : " Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management the exercise of reasonable care, caution and maritime skill, and if these are neglected and disasters occur the towing boat must be visited with the consequences. It is admitted in the argument and proved by the evidence that the canal boat was not to blame, and the inquiry therefore is, was the steamer equally without fault ?" In that case a barge or canal boat near the rear end of as many as forty in all in tow of the steamer into the harbor of New York was damaged by collision with a vessel lying at anchor in it, and the court held that the commander of the steamer with so long a line of canal boats in tow was guilty of negligence in neglecting to divide it before he attempted to tow such a line through the harbor. There was no recognition in that case of the doctrine of principal and agent as applicable to the relation existing between the steamer and the crew of the canal boat.

In the case under consideration it nowhere appears that those in charge of the tug did not exercise reasonable care, caution, and maritime skill, or that these were neglected, but it does appear that the disaster occurred from the neglect of those in charge of the barges from not steering them in the wake of the tug, and from being absent from their post of duty, so as not to be able to answer the signal of the tug to steer the barges aright when that signal was given by those in command of the tug.

In the case of *Sproul* v. *Hemmingway*, 14 *Pick*. 1, it was decided that the owner of a brig towed lashed to the side of a steamboat employed in the business of towing vessels on the Mississippi River below New Orleans, and which through the negligence of the master and crew of the steamboat, over whom those in charge of the brig had no control, was brought into collision with a schooner at anchor, was not responsible for the damage sustained by the schooner. The court in that case, while very properly holding that the owner of the brig was not respon-

sible for the negligence of the master and crew of the steamboat towing it, very clearly states what would have been their opinion had the brig been towed astern of the steamboat by means of a cable, and the damage had been occasioned by the negligence of those on board of the brig, for they say " that on board a ship towed astern of a steamer by means of a cable something may and ought to be done by the master and crew keeping watch, observing and obeying orders and signs, and if there be any want of care and skill in the performance of these duties and damage ensue, then the case we have been considering does not exist; the damage is then attributable to the master and crew of the towed ship, and they and their owners must sustain it." The jury were so instructed at the trial and it was left to them to find whether the damage was caused by the negligence of the one or the other.

In the case of *The Owners of the Brig James Gray* v. *The Owners of the Ship John Fraser*, 21 *Wall.* 184, it was decided that where a vessel being towed into port by a steam-tug came into collision with a vessel at anchor, and the steam-tug and vessel at anchor were both in fault, the loss was to be equally divided between them, provided the ship in tow was thrown against the vessel at anchor without any fault or negligence of the vessel in tow. The collision occurred in Charleston harbor. The John Fraser was being towed into it by a steamer and was driven against the James Gray lying at anchor and injured her, for which the owners of the James Gray sued the owners of the John Fraser; and the court said that, " as this collision was forced upon the John Fraser by the controlling power and mismanagement of the towing steamer, and not by any negligence or fault on her part, she ought not to be answerable for the consequences. Suppose, however, that it had not been forced on her by the controlling power and mismanagement of the towing steamer, but by some fault or negligence on her part, is not the inference irresistible that the decision would have been that the owners of the towing steamer were not, but the owners of the John Fraser were answerable for the consequences. It was not contended in that case that the relation of principal and agent existed between the owners of the towing steamer and the master and crew on board of the John Fraser which she had in tow.

If such relation had existed between them then the John Fraser would not have been answerable for the consequences had they resulted solely from fault and negligence on her part, or on the part of her master and crew, because if the latter were the agents of the owners of the towing steamer at the time, their fault and negligence would have been the fault and negligence of their principals, the owners of the steamer which had her in tow.

The case of *Sturgis* v. *Boyer et al.*, 24 *How.* 110, established these principles that where the tug and tow were both under the command of the master of the tug, who gave all the orders, none of the ship's crew being on board the tug except the mate, who did not interfere with the management of the vessel, the tug is responsible for the whole loss incurred. Second, that a case may arise when both the tow and the tug are jointly liable for the consequences of the collision, as where those in charge of the respective vessels jointly participate in their control and management, and the master or crews of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Third, whenever the tug is under the charge of her master and crew, and in the usual and ordinary course of such an employment undertakes to tow a vessel which for the time being has neither her master nor crew on board, over waters where such accessory motive power is necessary or is usually employed, she must be held responsible for the proper management of both vessels. In that case the court says : "Whether the party charged ought to be held liable is made to depend in all cases of this description on his relation to the wrong-doer. If the wrongful act was done by himself or was occasioned by his negligence, of course he is liable, and he is equally so if it was done by one toward whom he bore the relation of principal ; but liability ceases where the relation itself entirely ceases to exist, unless the wrongful act was performed or occasioned by the party charged."

The law applicable to this subject in my opinion is correctly stated by Judge Nelson in the case of the *Express*, 1 *Blatchf. C. C. Rep.* 365. He says "The business of towing by steamboats is comparatively modern, and has become extensive on all the navigable rivers of the country. The obligations and responsi-

bilities arising out of this kind of navigation and properly resting upon the respective vessels concerned are novel and peculiar, and there may be some difficulty in assigning to each vessel its proper measure of responsibility, a difficulty that is intrinsic and arises out of the peculiar relations which the respective vessels bear to each other in the course of the navigation. In all cases where the tug is under the direction and control of the master and hands on board of the tow, there is no difficulty in assigning to the latter a responsibility for all the damage that may happen through the fault of either vessel. The converse of the proposition will hold equally good where the tow is under the exclusive direction and control of the tug. But where there is a divided command and direction in the navigation of the vessel, there must necessarily be in some measure a divided and several responsibility assigned to each. What that measure shall be is a question of some difficulty. In the case before us the helm of the tow was under the direction of her captain, but all other means used in her navigation were under the absolute control and direction of the master of the tug. Such is understood to be the common relation which these different vessels bear to each other in the business of towing up and down the North River. Now, although the tow and her master and owners are properly chargeable for any injuries that may happen by reason of neglect or unskillfulness in her management in the course of the voyage, it by no means follows that the tug is free from fault. Her power over the navigation of the tow is paramount and controlling, and a corresponding responsibility attaches. Therefore in all cases where the proper and reasonable exercise of that power can be interposed for the purpose of arresting and avoiding the impending injury, she is bound to exert it faithfully and should be held answerable in case of neglect. Her whole duty is not discharged when she is so navigated as to avoid committing immediately the injury herself."

In the present case it would have been perfectly proper for the court below to have instructed the jury that it was the duty of the person in charge of the tug to exercise a watchful supervision with respect to those steering the barges, and to see that they steered the barges properly throughout the entire passage

through the canal, and if they neglected so to do, and only attended to this duty when the collision was unavoidable, omitting it before that, then that neglect was such default of duty as to render the owners of the tug responsible as well as the owners of the barges. Whether there was such a want of supervision was a fact upon which the jury might properly have passed.

I therefore am of the opinion that the court below erred in their charge to the jury that the relation of principal and agent or subordinates existed between the owners of the steam-tug and the persons on board of the barge whose duty it was to steer them while being towed by the tug through the canal, and that the owners of the tug were their principals and they were their agents or subordinates in their joint or common undertaking, and as such principals the owners of the tug were liable for any injury which resulted to the sloop and the plaintiffs from the negligence of those whose duty it was to steer the barges. We do not know upon what grounds the jury returned their verdict. It may have been because in their opinion on the facts proved that the collision was occasioned by the mismanagement, want of care, or negligence of those in command of the tug, or it may have been because they believed it was occasioned by the negligence of those whose duty it was to steer the barges. The charge of the court would have warranted the verdict on that ground alone, even if the jury were of opinion that those in command of the tug had been guilty of no default whatever in the matter. It was, therefore, in my opinion too broad, and for that reason erroneous in law. I am accordingly of the opinion that the judgment of the court below in this case should be reversed.