# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAROL HUDSON, | ) | |
| | ) | |
| Appellant/ | ) | |
| Claimant-Below, | ) | |
| | ) | |
| v. | ) | C.A. No. S23A-10-002 NEP |
| | ) | |
| | ) | |
| BEEBE MEDICAL CENTER, | ) | |
| | ) | |
| Appellee/ | ) | |
| Employer-Below. | ) | |

Submitted:  November 1, 2023
Decided:  January 3, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Appeal from the Decision of the Industrial Accident Board*

**AFFIRMED**

James R. Donovan, Esquire, Doroshow, Pasquale, Krawitz & Bhaya, Dover, Delaware, *Attorney for Appellant*.

Keri L. Morris-Johnston, Esquire, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, *Attorney for Appellee*.

**Primos, J.**

Before this Court is the appeal of Carol Hudson ("Ms. Hudson") from the decision of the Industrial Accident Board (the "Board" or the "IAB") denying her petition for worker's compensation benefits for her COVID-19 illness. The Board found that Ms. Hudson failed to prove by a preponderance of the evidence (1) that she contracted COVID-19 at the workplace of her employer, Beebe Medical Center ("Beebe") and (2) that COVID-19 was an occupational disease in the context of her employment at Beebe.

Ms. Hudson worked as a front-line nurse for Beebe on a COVID-19 floor in the fall of 2020. She contracted COVID-19 at some point in October 2020 and was hospitalized on October 21. Her two sons, Michael and Skyler Hudson, contracted the disease around the same time. Tragically, Michael Hudson died of COVID-19 complications while Ms. Hudson was in the hospital. Ms. Hudson believes that she contracted COVID-19 at work and subsequently infected her sons. Beebe argues that she was more likely infected outside of work, likely by her son Michael.

For the reasons that follow, the Court finds that the Board's conclusion on the first issue—that Ms. Hudson failed to prove that she contracted COVID-19 at work—is supported by substantial evidence and free from legal error. The Board's decision is therefore **AFFIRMED** on that basis and the Court need not reach the occupational disease issue.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 7, 2021, Ms. Hudson filed a Petition to Determine Compensation Due with the Board.[1] The Board held a hearing on Ms. Hudson's petition on September 26, 2022.[2] Ms. Hudson presented video testimony from her surviving son, Skyler, and testified live at the hearing herself. Jennifer Montgomery, a Beebe

---

[1] R. Tab 1, Claimant's Pet. to Determine Compensation Due to Injured Employee.
[2] R. Tab 2, Hr'g Tr. Sept. 26, 2022 [hereinafter "Hr'g Tr."].

2

employee, testified for Beebe.  Orn Eliasson, M.D., and Alfred E. Bacon, III, M.D., testified via deposition as experts for Ms. Hudson and for Beebe, respectively.

## I.   The Hudson Household

In the fall of 2020, Ms. Hudson and her two sons, Skyler and Michael, lived together in a five-to-six-bedroom farmhouse.[3]  Ms. Hudson worked at Beebe, Skyler attended the University of Delaware virtually,[4] and Michael helped to care for the family farm.[5]  Ms. Hudson confirmed that Michael handled various tasks for the family farm, including going to the farmer's market and making deliveries to customers.[6]  Michael would wear a mask when making deliveries and going to stores.[7]  Skyler testified that the farmer's markets occurred twice a week for four hours at a time.[8]

Ms. Hudson did some shopping but would always wear a mask and stay six feet away from other shoppers.[9]  Ms. Hudson and Michael would often order food to carry out and dined inside restaurants on two occasions.[10]  Michael drove Ms. Hudson to work at Beebe each day, about 20 to 25 miles per Skyler's estimation.[11]  Ms. Hudson confirmed that Michael drove her to work and that they would eat together in the car.[12]  The drive took approximately 35 to 45 minutes depending on traffic.[13]  Credit card records showed that someone in Ms. Hudson's household made

---

[3] R. Tab 7, Claimant's Ex. 2 [hereinafter "Skyler Hudson Dep."] at 14.
[4] In-person classes were suspended because of the COVID-19 pandemic. *Id.* at 5.
[5] *Id.* at 16.
[6] Hr'g Tr. at 92–94.
[7] *Id.* at 94.
[8] Skyler Hudson Dep. at 18.
[9] *See* Hr'g Tr. at 53.
[10] *Id.* at 51–53.
[11] Skyler Hudson Dep. at 28.
[12] Hr'g Tr. at 76.
[13] *Id.* at 83.

purchases at a number of restaurants and stores on or around October 13, 14, and 15.[14]

## II. Working Conditions at Beebe

Ms. Hudson testified that she has been working for Beebe for 39 years and was working as a nurse in 2020.[15] She stated that work was chaotic and very stressful on a day-to-day basis when COVID-19 patients started arriving at the hospital.[16] She worked 48 to 60 hours a week because Beebe did not have enough nurses.[17] Regarding personal protective equipment ("PPE"), she testified that Beebe supplied gowns, masks, face shields, and gloves.[18] Ms. Hudson was generally dissatisfied with the quality of the PPE provided.[19] Nevertheless, she maintained that she always wore PPE when caring for patients and that she was very careful about wearing her PPE properly.[20]

Beebe called Jennifer Montgomery ("Montgomery"), a nurse case manager for worker's compensation and FMLA at Beebe, as a witness.[21] She testified that nurses were required to wear surgical masks for all direct patient care and N-95 masks for COVID-positive or suspected COVID patients.[22] Montgomery agreed that the situation was at times chaotic in some respects, but not with respect to PPE distribution.[23] To her knowledge, nurses and other employees always had adequate

---

[14] *See id.* at 76–80.
[15] *Id.* at 45.
[16] *Id.* at 46.
[17] *Id.* at 51.
[18] *Id.* at 48.
[19] *See id.* at 48–50 (describing issues with expired gowns, ill-fitting masks, and breaking mask strings, and explaining that the masks aggravated Ms. Hudson's asthma).
[20] *See id.* at 72–74.
[21] *Id.* at 97.
[22] *Id.* at 103.
[23] *Id.*

PPE.[24]  On cross-examination, however, Montgomery acknowledged that she was not involved with day-to-day activities on the floor on which Ms. Hudson worked.[25]

Montgomery also testified that whenever a Beebe employee arrived for work, the employee's temperature was taken and the employee would be asked a series of questions about potential symptoms.[26]  If the employee answered yes to any of the questions, or otherwise exhibited symptoms, he or she would be turned away and had to be cleared by a COVID test before coming back to work.[27]  Ms. Hudson agreed on cross-examination that Beebe had a policy of checking for symptoms when employees arrived for work, and that she would not have been allowed to enter if she had indicated that she was experiencing COVID-like symptoms.[28]

In October of 2020, the hospital assigned a number of COVID-19 patients to Ms. Hudson's care.[29]  Several incidents stood out to her that month.  First, on an unspecified date in October, an elderly patient tested positive for COVID after Ms. Hudson had already cared for him for several days without COVID protocols in place.[30]  On October 8, she lost her high-quality face shield and Beebe replaced it with a cheaper, less effective alternative.[31]  Perhaps most significant, on October 12, Ms. Hudson was leaning directly over an unmasked and critically ill COVID-19 patient and trying to resecure the patient's ventilator mask when her own mask band

---

[24] *See id.* at 104 ("Q: But are you aware of any nurses or employees not having PPE? A: No. . . . We feared we would get to that and we did not get to the point where we did not have PPE for staff.").
[25] *Id.* at 107.
[26] *Id.* at 101–02.
[27] *Id*. at 102.
[28] *Id.* at 69–70.
[29] *Id.* at 55–56.
[30] *Id.* at 59–60.
[31] *Id.* at 56–57.

broke.[32]  Ms. Hudson testified that she immediately reported the incident and obtained a new mask.[33]

## III.  Timeline of COVID Symptoms

Skyler testified that his mother was the first in the household to exhibit COVID-19 symptoms by several days,[34] beginning on October 15.[35]  Her initial symptoms included heavy coughing, fatigue, and a headache.[36]  He recalled that Michael began showing symptoms about three days later,[37] "[l]ate on the 17th."[38] Michael had nausea, a cough, and a fever.[39]  Skyler testified that he became sick a day after Michael,[40] on October 18.[41]  At that point, he went to get tested for COVID-19 and persuaded Ms. Hudson to go with him.[42]  They both tested positive.[43]  Skyler testified that Michael was "perfectly healthy for at least a couple days" after Ms. Hudson started showing symptoms and noted that he was still well enough to drive Ms. Hudson to the emergency room when her symptoms became severe.[44]

Like Skyler, Ms. Hudson testified that she was the first in her household to experience COVID-19 symptoms, followed by Michael and then Skyler.[45]  She stated that her symptoms began around October 14 or 15 but she did not realize she

---

[32] *Id.* at 60–62.
[33] *Id.* at 62–63. Montgomery testified that she found no documentation of a broken mask or a request for a new mask on or around October 12. *Id.* at 105. She agreed, however, that the incident could have occurred as described by Ms. Hudson. *Id.* at 108.
[34] Skyler Hudson Dep. at 8.
[35] *Id.* at 20–21.
[36] *Id.* at 8.
[37] *Id.* at 9.
[38] *Id.* at 21–22.
[39] *Id.* at 9.
[40] *Id*. at 9–10.
[41] *Id.* at 22.
[42] *Id*. at 10.
[43] *Id*. Skyler believed that Ms. Hudson had already been hospitalized by the time the test results came back. *Id.*
[44] *Id.* at 12–13.
[45] Hr'g Tr. at 63.

was sick at the time because she "had been coughing for months."[46]  She repeated several times throughout her testimony that coughing and shortness of breath were regular symptoms for her due to asthma and various allergies.[47]

Ms. Hudson testified that she worked through October 19 and attended her aunt's funeral on October 20.[48]  She developed a fever the night of October 19 or 20.[49]  When she returned home from the funeral, Skyler insisted that she had COVID-19.[50]  She did not believe him but agreed to go and get tested.[51]  On October 21, Ms. Hudson felt off-balance and dizzy.[52]  She told Michael that she was really sick and he drove her to the emergency room.[53]  She testified that Michael died the following day, October 22, having first exhibited symptoms on October 19.[54]  Ms. Hudson believes that she was infected at work and passed it to Michael.[55]

At the hearing, Ms. Hudson was confronted with two documents suggesting that her symptoms actually began on October 19.  The first was an emergency room record indicating that she presented to the emergency room "with cough present since Monday," i.e., October 19.[56]  Ms. Hudson testified that this statement was inaccurate.[57]  When asked for clarification, she stated that she had been coughing for months.[58]  The second document was a COVID-19 intake form (created by Beebe

---

[46] *Id.* at 66.

[47] *See id.* at 67 (explaining that she would have mentioned the symptoms if they had been "any different than my normal" but that she "had been coughing for months and . . . had been short of breath for months"); *id.* at 68 ("I was accustomed to being short of breath and coughing nonstop."); *id.* at 70 ("My symptoms were no different than what I was used to for months, for months.").

[48] *Id.* at 54.

[49] *Id.* at 84.

[50] *Id.* at 54–55.

[51] *Id.*

[52] *Id.* at 55.

[53] *Id.*

[54] *Id.* at 94.

[55] *Id.* at 64.

[56] *Id.* at 83.

[57] *Id.* at 84.

[58] *Id.*

7

when she called in sick for work), which indicated a symptom start date of October 19.[59] Ms. Hudson stated that she did not recall giving that information.[60]

Ms. Hudson's expert, Dr. Eliasson, concluded that her COVID-19 symptoms began on October 14, 2020.[61] He based his timeline on hospital records, emergency room records, and Ms. Hudson's recollection as conveyed to him in a written questionnaire.[62] Based on information from Ms. Hudson, Dr. Eliasson believed that Michael became symptomatic on October 19, five days after what he believed to be the onset of Ms. Hudson's symptoms on October 14.[63] Dr. Eliasson also indicated that the mean incubation period after infection is approximately six days.[64] This incubation period, he concluded, was consistent with Michael's catching COVID-19 from his mother.[65] Finally, based on Skyler's onset of symptoms around October 21 or 22, he concluded that Skyler could have caught it from either Ms. Hudson or Michael.[66]

However, Beebe's expert, Dr. Bacon, testified that Ms. Hudson had told him that she felt fine the morning of October 19 when she attended her aunt's funeral[67] and developed symptoms by that evening.[68] Dr. Bacon agreed that emergency room records from October 21 also indicated a symptom onset of October 19.[69] According to Dr. Bacon, Ms. Hudson also told him that Michael had started "feeling a little

---

[59] *See id.* at 86.
[60] *Id.*
[61] R. Tab 6, Claimant's Ex. 1 [hereinafter "Dr. Eliasson Dep."] at 18.
[62] *Id.*
[63] *Id.* at 22.
[64] *Id.* at 16.
[65] *Id.* at 22.
[66] *Id.* at 22–23.
[67] Ms. Hudson testified that the funeral was on October 20.
[68] R. Tab 10, Employer's Ex. 2 [hereinafter "Dr. Bacon Dep."] at 13; *see also id.* at 13–14 ("Q. And, Doctor, to clarify, based on your evaluation of Ms. Hudson, when did she tell you she began with symptoms? A. She was very clear October 19th, she said 'I felt pretty good. I felt normal when I went to my aunt's funeral services and I wore a mask.'").
[69] *Id.* at 14–15.

8

lousy" two days earlier, on October 17.[70]  In response to Dr. Eliasson's testimony that Ms. Hudson's symptoms began on October 14, Dr. Bacon opined that it would not have been appropriate for a healthcare worker to continue working for several days after the onset of COVID-19 symptoms.[71]  With regard to Michael, Dr. Bacon testified that it would be "distinctly unusual" for someone to first present symptoms and die so quickly thereafter, suggesting that Michael was sick for several days prior to his death on October 21.[72]

## IV. Conflicting Expert Opinions

Overall, Dr. Eliasson's conclusion, to a reasonable degree of medical probability,[73] was that Ms. Hudson contracted COVID-19 "[o]n her job at Beebe Hospital."[74]  He testified, based on a number of studies, that healthcare workers like Ms. Hudson faced a heightened risk of contracting COVID-19.[75]  He emphasized that she was in a high-risk occupation and regularly interacting with COVID-19 patients.  He also noted that Ms. Hudson had described feeling burnt out, working long hours, and using "inadequate" PPE "based on her recollection."[76]  He also testified that she had multiple possible work exposures on October 8, 9, and 10 and that she was exposed on October 12 when her mask strap broke.[77]  In his opinion, "she had an extraordinarily high risk of catching COVID on the job" and "it was almost inevitable that she was going to catch COVID on this job given the circumstances."[78]

---

[70] *Id.* at 19–20.

[71] *Id.* at 16.

[72] *Id.* at 20. This is a day earlier than Ms. Hudson testified that Michael died.

[73] While not explicitly stated in the deposition, the parties stipulated at the hearing that Dr. Eliasson's testimony was to a reasonable degree of medical probability. *See* H'rg Tr. at 95–96.

[74] Dr. Eliasson Dep. at 23–24.

[75] *See id.* at 8–15.

[76] *Id.* at 24–25.

[77] *Id.* at 18–19.

[78] *Id.* at 25.

9

Contrary to Dr. Eliasson, Dr. Bacon opined "with a high degree of medical certainty" that Hudson "acquired Covid from her son Michael who was active in the community, was sick before she was sick," and "died the day she was admitted . . . ."[79] Dr. Bacon testified that a properly attired nurse with effective PPE is not at greater risk of contracting COVID-19 than an employee in the general workforce.[80] He stated that "in a well-designed environment, a hospital that's properly managed, which I would guess Beebe is," the risk of contracting COVID-19 "would not be a higher risk than other employment experiences."[81] In response to the studies cited by Dr. Eliasson, Dr. Bacon agreed that the data was "good" but opined that frontline workers are at a higher risk not from patient exposure (which is mitigated by proper use of PPE) but by the necessity of going to work every day and thus leaving the house more often.[82] The cited studies, he opined, do not "remotely get to the point of the matter in this case," which he described as "what is the risk of one single exposure to getting Covid in the healthcare environment with proper PPE."[83] That data, according to Dr. Bacon, is "not well known."[84]

Dr. Bacon emphasized that Ms. Hudson was "obsessed" with PPE and knew how to use it well.[85] He was aware of only one PPE breakdown that would have increased Ms. Hudson's exposure risk at work—the October 12 incident in which her mask strap broke.[86] He opined that a broken mask strap for five minutes posed

---

[79] Dr. Bacon Dep. at 28.
[80] *Id.* at 22.
[81] *Id.* at 23.
[82] *See id.* at 24 ("The acquisition of Covid in the healthcare environment is driven by more things than just patient exposure. As a frontline person, I'm going to work everyday [sic] and I'm exposed to my colleagues at work everyday. I'm stopping at the grocery store more, I'm out and about."); *id.* at 25 ("So statistically speaking, you know, most of the providers are getting Covid not from patients, let's be very crisp [sic] there.").
[83] *Id.* at 25.
[84] *Id.*
[85] *Id.* at 17–18.
[86] *Id.* at 26.

a "limited risk" of infection (as compared to the 15 minutes required to be designated a "high risk" exposure by the CDC).[87] He also noted that it was possible but very unlikely that an exposure on October 12 would lead to symptoms as early as October 14 as alleged by Dr. Eliasson.[88]

## V. The Board's Decision and Ms. Hudson's Appeal

The Board issued a decision on October 24, 2022, denying Ms. Hudson's petition. The Board concluded that she had not met her burden of proving by a preponderance of the evidence "both that she contracted COVID-19 from a workplace exposure and that, with respect to her particular employment, COVID-19 constituted an occupational disease."[89] Ms. Hudson timely filed a notice of appeal in the Superior Court for Kent County,[90] and briefing followed.

On August 28, 2023, the Court issued a letter to the parties in which it *sua sponte* raised a jurisdictional issue, i.e., that although the alleged injury had apparently occurred in Sussex County, the appeal had been filed in the Superior Court for Kent County.[91] The parties responded and agreed that the Superior Court for Kent County lacked jurisdiction and that the matter should be heard by the Superior Court for Sussex County.[92] Accordingly, the Court denied jurisdiction and allowed Ms. Hudson 60 days to file a written election of transfer pursuant to 10 *Del.*

---

[87] *Id.*

[88] *Id.* at 26–27.

[89] R. Tab 12, *Hudson v. Beebe Med. Ctr.*, No. 1516467, at 33 (Del. I.A.B. Oct. 24, 2022) [hereinafter "Board Decision"].

[90] R. Tab 13, Notice of Appeal Filed Nov. 2, 2022.

[91] Letter to Counsel (D.I. 18) (docket item or "D.I." in Kent County case—*see infra* note 95). *See* 19 *Del. C.* § 2349 (providing that appeals must be filed in "the Superior Court for the county in which the injury occurred").

[92] D.I. 19, 20 (docket items in Kent County case—*see infra* note 95).

*C.* § 1902.[93] Ms. Hudson timely filed the election of transfer,[94] and on October 31, 2023, the appeal was transferred to the Superior Court for Sussex County.[95] On November 1, 2023, the appeal was reassigned by the President Judge to the same judicial officer to whom it had been assigned while in Kent County.[96]

## STANDARD OF REVIEW

On an appeal from the Board, the Court's inquiry is limited to whether the Board's conclusions are supported by substantial evidence and free from legal error.[97] Questions of law are reviewed *de novo*.[98] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[99] In making this determination, the Court does not reweigh the evidence, reassess witness credibility, or make its own factual findings or conclusions.[100] Rather, the Court must "search the entire record to determine whether, on the basis of all of the testimony and exhibits before the [Board], it could fairly and reasonably reach the conclusion that it did."[101] "If the Board's decision is

---

[93] Order (D.I. 21) (docket item in Kent County case—*see infra* note 95). *See, e.g.*, *Cooper v. Capitol Nursing*, 2010 WL 3447705, at *1 (Del. Super. Aug. 31, 2010) (transferring an Industrial Accident Board appeal from New Castle County to Sussex County pursuant to 10 *Del. C.* § 1902); *Red Lobster v. Cole*, 1998 WL 732955, at *1 (Del. Super. May 12, 1998) (transferring an Industrial Accident Board appeal to Kent County); *Fam. Ct. of Del. v. Giles*, 384 A.2d 623, 624–25 (Del. 1978) (holding that an appeal from the Equal Employment Review Board filed in the Superior Court in the wrong county should have been transferred to the correct county pursuant to 10 *Del. C.* § 1902 rather than dismissed).

[94] Election of Transfer (D.I. 24) (docket item in Kent County case—*see infra* note 95).

[95] Order (D.I. 25) (docket item in Kent County case). The Kent County civil action number was K22A-11-002; once it was transferred to Sussex County, the civil action number became S23A-10-002. The D.I. citations to this point have referred to the Kent County civil action number. All subsequent docket item references relate to the Sussex County civil action number.

[96] Mem. From President Judge Jan R. Jurden (D.I. 6).

[97] *Glanden v. Land Prep, Inc.*, 918 A.2d 1098, 1100 (Del. 2007).

[98] *Id.* at 1101.

[99] *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994) (citing *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981)).

[100] *Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 394 (Del. 2015).

[101] *Nat'l Cash Register v. Riner*, 424 A.2d 669, 674–75 (Del. Super. 1980).

free from legal error and supported by substantial evidence, this Court must sustain the Board's decision even if this Court might have decided the case differently if it had come before it in the first instance."[102]

## DISCUSSION

Occupational diseases are compensable under the Delaware Workers' Compensation Act in the same manner as injuries arising from accidents in the workplace.[103]  In order to receive compensation for an occupational disease, the claimant must show that "the employer's working conditions produced the ailment as a natural incident of the employee's occupation in such a manner as to attach to that occupation a hazard distinct from and greater than the hazard attending employment in general."[104]  In a worker's compensation case before the Board, the claimant bears the burden of proving causation by a preponderance of the evidence.[105]  A disease is not an occupational disease if contracted outside of the workplace, even if it is an ailment that might qualify as a compensable occupational disease if contracted in the workplace.[106]

---

[102] *Gutierrez v. Jamestown Painting*, 2019 WL 972161, at *3 (Del. Super. Feb. 26, 2019).

[103] *See* 19 *Del. C.* § 2328 ("The compensation payable for death or disability total in character and permanent in quality resulting from an occupational disease shall be the same in amount and duration and shall be payable in the same manner and to the same persons as would have been entitled thereto had the death or disability been caused by an accident arising out of and in the course of the employment.").

[104] *Anderson v. Gen. Motors Corp.*, 442 A.2d 1359, 1361 (Del. 1982); *accord Diamond Fuel Oil v. O'Neal*, 734 A.2d 1060, 1064 (Del. 1999).

[105] *Goicuria v. Kauffman's Furniture*, 1997 WL 817889, at *2 (Del. Super. Oct. 30, 1997) ("The claimant has the burden of proving causation not to a certainty but only by a preponderance of the evidence."), *aff'd*, 706 A.2d 26 (Del. 1998) (TABLE).

[106] *See* 19 *Del. C.* § 2301(4) ("'Compensable occupational diseases' includes all occupational diseases arising out of and in the course of employment only when the exposure stated in connection therewith has occurred during employment."). While the issue of whether Ms. Hudson contracted COVID-19 as the result of a workplace exposure is described as a stand-alone "causation" inquiry by the Board in this case, *see* Board Decision at 25, the Delaware Supreme Court has used the term "causation" to refer to the entire occupational disease test. *See Diamond Fuel*, 734 A.2d at 1064–66 (noting that under the *Anderson* test, the employee bears the burden of proving that he or she has contracted a compensable occupation disease, and determining that "the

13

## I. The Board Applied the Correct Burden of Proof.

In order for a COVID-19 infection to be compensable, the burden is on the claimant to show, *inter alia*, that it is more likely than not that he or she contracted the virus in the workplace.[107] First, the Court notes that the Board consistently stated the correct standard of review throughout its causation analysis.[108] Ms. Hudson argues that the Board nevertheless applied a higher burden of proof than the one it articulated. She contends that the Board required her to prove the exact date of

Board's conclusion that O'Neal failed to sustain his burden of proof on causation lacks substantial evidential support"). However, in the case of a viral infection, whether the disease was contracted at work or elsewhere is an appropriate threshold inquiry. In terms of the occupational disease "causation" test, contracting the virus at work is best characterized as a necessary element of the first portion of the test, i.e., whether "the employer's **working conditions produced the ailment** as a natural incident of the employee's occupation . . . ." *Anderson*, 442 A.2d at 1361 (emphasis supplied). In a case where COVID-19 was contracted outside of work, the subsequent illness is not an ailment produced by the employee's working conditions. Of course, the fact that a disease **is** contracted at the workplace does not necessarily mean that it qualifies as a compensable occupational disease under the *Anderson* test. *See id.* at 1360 (an illness "does not become an occupational disease simply because it is contracted on the employer's premises") (quoting *Air Mod Corp. v. Newton*, 215 A.2d 434, 442 (Del. 1965)). *See also Fowler v. Perdue Farms, Inc.*, 2023 WL 6888918, at \*9 (Del. Super. Oct. 18, 2023) [hereinafter *Fowler II*] (although employee had contracted COVID-19 at the workplace, a poultry processing plant, his condition did not qualify as a compensable occupational disease because the hazard of contracting the disease at the plant was not distinct from that attending employment in general).

[107] *See Fowler v. Perdue Farms, Inc.*, 2022 WL 807327, at \*7 (Del. Super. Mar. 16, 2022) [hereinafter *Fowler I*] ("The appropriate burden is whether or not it is **more likely than not** that Fowler contracted COVID-19 from his workplace.") (emphasis in original). The cited decision is referenced hereinafter as *Fowler I* to distinguish it from the later decision in the same case cited in *supra* note 106 as *Fowler II*.

[108] *See, e.g.*, Board Decision at 22 ("In this case, Claimant bears the burden of proving both that it is more likely than not that she contracted COVID-19 at work and that COVID-19 is an occupational disease."); *id.* at 25 ("In this case, Claimant has not proven that she contracted COVID-19 from work. The evidence was inconsistent and does not support a finding that, more likely than not, Claimant contracted COVID-19 from work on October 12, 2020."); *id.* at 31 ("Based on all of the above, the Board concludes that Claimant failed to prove that it is more likely than not that she contracted COVID-19 from work."); *id.* at 31 n.1 ("[T]he fact that there is credible evidence of a viable alternative to a workplace exposure weighs against the conclusion that Claimant's COVID exposure was more likely than not from work.").

14

infection, which she posits is impossible in most or perhaps all COVID-19 cases in light of the virulent but initially undetectable nature of the disease. [109]

Ms. Hudson specifically takes issue with the Board's emphasis on whether she contracted COVID-19 when her mask band broke on October 12, arguing that she was denied compensation solely because she could not prove that she was infected during that specific incident. The second sentence of the Board's causation analysis—"evidence was inconsistent and does not support a finding that, more likely than not, Claimant contracted COVID-19 from work on October 12, 2020"[110]—lends some support to this argument. That turn of phrase is unfortunate because, as a matter of basic probability, the likelihood that Ms. Hudson acquired COVID-19 at work at some point in October is higher than the likelihood that she acquired it on October 12 specifically.

Viewed as a whole, however, the Board's analysis addressed far more than the October 12 mask incident. After concluding that it was unlikely that Ms. Hudson contracted COVID-19 when her mask band broke on October 12, the Board turned to the issue of her PPE use in general. It observed that Ms. Hudson "confirmed that she always wore protective equipment" while caring for COVID-19 patients.[111] The Board credited Dr. Bacon's conclusion that diligent PPE use significantly mitigated her risk of contracting COVID-19 at work.[112] The Board considered the possible timelines of exposure—including the October 12 incident—and symptom onset.[113] Moreover, the Board considered Dr. Eliasson's and Dr. Bacon's competing opinions, including the data submitted by Dr Eliasson, and found Dr. Bacon more

---

[109] Opening Br. at 15 (D.I. 3).
[110] Board Decision at 25.
[111] *Id.* at 26.
[112] *Id.*
[113] *See id.* at 26–29.

15

persuasive.[114]  Most importantly, the Board expressly adopted Dr. Bacon's conclusion that it was more likely that Ms. Hudson acquired COVID-19 from her son Michael, rather than while working at Beebe.[115]

Ms. Hudson argues that "there will always be other *possible* sources of infection" and that the Board's analysis implicitly adopts an impossible standard for any claimant to satisfy.[116]  Ms. Hudson is correct that the Board considered other possible sources of exposure.[117]  However, the Board nowhere indicated that any *possible* alternative to workplace exposure necessarily defeats a worker's compensation claim—rather, it explained that "credible evidence of a viable alternative to a workplace exposure weighs against" a potential determination that Ms. Hudson had satisfied her burden of proof.[118]  Read as a whole, the Board weighed Ms. Hudson's risk of exposure at work against possible out-of-work exposures and concluded that the latter was more likely.[119]  This is a conclusion of fact to be reviewed under the substantial evidence standard, not a misapplication of the burden of proof that this Court can review *de novo*.

Ms. Hudson also argues that occupational disease case law generally does not require an employee "to show the specific moment when their exposure caused them to become ill."[120]  She cites *Diamond Fuel Oil v. O'Neal*[121] and *Evans Builders, Inc.*

---

[114] *See id.* at 29–31.

[115] *Id.* at 30 ("Dr. Bacon concluded that Claimant did not contract COVID from work, but it was more likely that she acquired it from her son Michael, who became ill before Claimant, and passed away the day after Claimant was admitted to the hospital. The Board agrees.").

[116] Opening Br. at 17 (emphasis in original).

[117] *See* Board Decision at 31 (explaining that Ms. Hudson "could have been exposed to COVID-19 outside of work, specifically from either of her sons, both of whom contracted COVID-19 during the same time frame").

[118] *Id.* at 31 n.1.

[119] *Cf. Fowler I*, 2022 WL 807327, at *7 (concluding that a "brief acknowledgement of the preponderance standard" was "belied by the Board's analysis of the facts . . . in reaching its decision").

[120] Opening Br. at 15.

[121] 734 A.2d 1060 (Del. 1999).

16

*v. Ebersole*[122] as examples in which the prevalence of an illness-inducing chemical or pathogen in the workplace was sufficient evidence to establish that the disease or ailment arose from the claimant's work.[123] First, as explained above, the Board did not require Ms. Hudson to prove that any one specific exposure at work caused her illness—it required her only to prove that the COVID exposure leading to her illness, more likely than not, occurred at work. Second, illness from COVID-19 is caused by contracting the virus at a specific point in time, and that exposure either occurs at the workplace or elsewhere. In *Diamond Fuel*, by contrast, the occupational disease at issue was a kidney disease caused by "chronic exposure" to a chemical in the workplace.[124] *Ebersole* is closer, but still not on point. In that case, this Court affirmed the Board's conclusion that the claimant's infection "was causally related to his job duties" in light of expert testimony that the organism causing the infection was "more prevalent in the poultry industry than in other environments."[125] Prevalence of a pathogen in the workplace may support a finding of compensability by the Board; however, it does not mean that the Board errs as a matter of law in considering viable competing theories of outside exposure.

Finally, this case differs from *Fowler I* in several critical respects. In that case, the Board reviewed other possible sources of exposure—including those classified as lower risk than Fowler's workplace by unrebutted expert testimony—and concluded that "**no one can say for sure** where [Mr. Fowler] contracted [COVID-19]."[126] This language and reasoning imposed, in effect, a beyond-a-

[122] 2012 WL 5392148 (Del. Super. Oct. 11, 2012), *aff'd*, 2013 WL 2371705 (Del. Feb. 11, 2013) (TABLE).
[123] Opening Br. at 16.
[124] 734 A.2d at 1064.
[125] 2012 WL 5392148, at *3.
[126] *Fowler I*, 2022 WL 807327, at *7 (alterations in original) (quoting *Fowler v. Perdue, Inc.*, No. 1501167, at 24 (Del. I.A.B. Dec. 31, 2020)).

reasonable-doubt standard on the claimant.[127]  Moreover, both the claimant's and the employer's experts in *Fowler I* agreed that Mr. Fowler more likely than not contracted COVID-19 in the workplace.[128]  Here, by contrast, Dr. Bacon[129] opined not only that Ms. Hudson, in his opinion, did not contract COVID-19 at Beebe, but that, "with a high degree of medical certainty," she contracted it from her son Michael.[130]

Ultimately, Ms. Hudson takes issue with Dr. Bacon's analysis and the Board's acceptance of it.  Thus, while framed as an error of law, Ms. Hudson's argument "relates to the IAB's consideration and weighing of evidence."[131]  Therefore, the real question posed by her arguments is whether the Board's conclusion was supported by substantial evidence in the record.

## II.    The Board's Conclusion Is Supported by Substantial Evidence.

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[132]  "[T]he IAB may adopt the opinion testimony of one expert over another; and that opinion, if adopted, will constitute substantial evidence for purposes of appellate review."[133]

First, Ms. Hudson takes issue with the Board's decision to credit Dr. Bacon's testimony over Dr. Eliasson's.[134]  Specifically, she notes that Dr. Eliasson presented numerous studies showing that healthcare workers face a higher risk of contracting COVID-19 than the general population and that Dr. Bacon "presented no studies,

---

[127] *Id.*

[128] *See id.* at *5 ("In this case, all expert testimony on causation points in one direction.").

[129] Dr. Bacon was also the expert for the employer in *Fowler I.*

[130] Dr. Bacon Dep. at 28.

[131] *Quality Assured Inc. v. David*, 2022 WL 17442738, at *5 (Del. Super. Dec. 6, 2022).

[132] *Diamond Fuel*, 734 A.2d at 1062.

[133] *Person-Gaines v. Pepco Hldgs., Inc.*, 981 A.2d 1159, 1161 (Del. 2009); *see also Chrysler Motors Corp. v. Taylor*, 1992 WL 354212, at *4 (Del. Super. Nov. 2, 1992) ("The IAB is free to accept one expert's opinion over another.").

[134] Opening Br. at 17.

instead relying on his own opinion based on experiences working in one hospital during the pandemic."[135]

The Board, however, gave several reasons for crediting Dr. Bacon's opinion over Dr. Eliasson's. First, it noted that his description of the timeline matched emergency room records from October 21, 2020, much closer in time to the events in question than Ms. Hudson's statements to Dr. Eliasson.[136] Second, it noted that Ms. Hudson did not see Dr. Eliasson in person and that he did not obtain any information from her about her or her household's out-of-work activities.[137] In addition, the Board credited Montgomery's testimony that Beebe supplied adequate PPE, and noted that Dr. Eliasson had not contacted Beebe in order to assess independently the adequacy of the PPE provided.[138] With respect to the studies cited by Dr. Eliasson, the Board was persuaded by Dr. Bacon's opinion that those studies did not speak directly to the risk of a healthcare worker's contracting COVID-19 from patient exposure "while working in the hospital with proper protective equipment."[139] That Dr. Bacon did not provide any contrary data[140] does not negate his qualifications to comment on the probative value of the data provided by Dr. Eliasson. To this point, Ms. Hudson, not Beebe, bore the burden of proof before the Board.

---

[135] *Id.*
[136] Board Decision at 28.
[137] *Id.* at 29. The Board did mischaracterize the extent of Dr. Eliasson's concession—while he agreed that he did not personally ask about Ms. Hudson's out-of-work activities, he also testified that he had some information about them from an earlier report by Dr. Bacon. *See* Dr. Eliasson Dep. at 36.
[138] Board Decision at 29–30.
[139] *Id.* at 30.
[140] Dr. Bacon stated that he could cite a paper showing that risk of exposure in a PPE-controlled environment is "around five percent" compared to eleven to sixty percent in the home environment, but there is no indication that the paper was ever identified or produced. *See* Dr. Bacon Dep. at 25.

Ms. Hudson also notes that both experts agreed that long hours and burnout raise the risk of infection by increasing instances of PPE misuse.[141] While this is a salient point, the Board placed great weight on both Dr. Bacon's and Ms. Hudson's testimony that Ms. Hudson was very conscientious about PPE and about using it correctly at all times.[142] It is not this Court's role to second-guess that judgment or to reweigh the evidence *de novo*. Here, the Board acted within its discretion in choosing Beebe's expert over Ms. Hudson's expert and "articulated its reasons for doing so."[143] "Where, as in the instant case, substantial evidence exists to support conflicting expert opinions, the Board is free to choose one expert's testimony over that of another."[144] Thus, that substantial evidence (or assuming *arguendo*, as Ms. Hudson asserts, *more* substantial evidence) also supported Dr. Eliasson's opinion is not a sufficient basis to disturb the Board's conclusions of fact on appeal.

Second, Ms. Hudson argues that she more likely than not contracted COVID-19 at work because the disease is undeniably more prevalent in a COVID ward than in the general community. She accuses Beebe and the Board of focusing too much on the granular details of the timeline and ignoring the broader point that "every day Ms. Hudson went to work, she encountered people with COVID-19."[145] This argument, however, fails to address the Board's factual finding that her son Michael most likely became ill first and then transmitted the virus to Ms. Hudson. Despite Skyler's and Ms. Hudson's testimony to the contrary, there was substantial evidence in the record to support the conclusion that Michael contracted COVID-19 first.

---

[141] *See* Dr. Eliasson Dep. at 15 ("So burnout every day increased the risk of COVID-19 infection by 260 percent."); *see also* Dr. Bacon Dep. at 29 (describing work on COVID floors as exhausting and noting that "as people get more tired, they have breaks in their PPE").

[142] Board Decision at 26.

[143] *Gutierrez*, 2019 WL 972161, at *4.

[144] *Id.* at *5; *cf. Hunsucker v. Scott Paper Co.*, 2023 WL 4078543, at *5 (Del. Super. June 16, 2023) (noting that such "substitution of judgment is not the role of the reviewing Court" where an appellant objects to the Board's having accepted one medical opinion over another).

[145] Opening Br. at 18.

First, his day-to-day activities involved some risk of community exposure.[146]  His death on October 21 or 22 suggests that he was exposed (and would have been symptomatic) several days prior to that date.  Second, Ms. Hudson purportedly told Dr. Bacon that she became ill on October 19 and that Michael was symptomatic two days earlier than that.  The Board noted that Dr. Bacon's testimony was consistent with the treatment records he reviewed, specifically the emergency room records, and found those contemporaneous records "more reliable than information obtained months or years after the event."[147]  Third, the Board found it unlikely that Ms. Hudson would continue working after a discernable symptom onset—or be allowed to do so by Beebe.[148]  Finally, Ms. Hudson's own testimony suggested that the coughing and shortness of breath she experienced as of October 14 was entirely normal for her.  She never adequately explained why she was unable to distinguish her regular symptoms from COVID-19 at the time but believes she is able to do so retroactively to testify that she became symptomatic before both of her sons.

Since the Board's conclusion that Michael Hudson introduced the COVID-19 infection to the household is supported by substantial evidence (i.e., enough for a reasonable mind to accept the conclusion), it is not dispositive even if, as Ms. Hudson argues, she was at the highest risk of the three people in her household to contract COVID-19.  Certainly, there is substantial evidence pointing the other way as well, particularly the consistent testimony by Ms. Hudson and Skyler regarding the order in which the symptoms manifested within their household.  However, "[e]ven if the Court may have decided the case differently in the first instance, the Court will not supplant its own judgment for that of the Board."[149]

---

[146] The Court does not mean to imply, nor does the record suggest, that anyone in Ms. Hudson's household behaved in a risky or irresponsible manner during this period.
[147] Board Decision at 28.
[148] *Id.* at 26–27.
[149] *Gutierrez*, 2019 WL 972161, at *4.

**III. The Court Will Not Reach the Issue of Whether COVID-19 Qualifies as an Occupational Disease in This Context.**

The Board separately determined that Ms. Hudson failed to meet her burden of establishing that COVID-19 was a compensable occupational disease. However, the finding that she failed to prove by a preponderance of the evidence that she contracted COVID-19 at work is sufficient to deny compensation.[150] The Court therefore need not reach the question of whether COVID-19 (if contracted by a nurse at Beebe under these circumstances) would otherwise qualify as an occupational disease under the Delaware Workers' Compensation Act.

## CONCLUSION

For the foregoing reasons, the Board's conclusion that Ms. Hudson failed to meet her burden of proving that it is more likely than not that she contracted COVID-19 at work is free from legal error and supported by substantial evidence in the record. Accordingly, the Board's denial of Ms. Hudson's Petition for Compensation Due is **AFFIRMED**.

**IT IS SO ORDERED.**

_____
Noel Eason Primos, Judge

NEP:tls
*Via File & ServeXpress*
oc:   Prothonotary
cc:   Counsel of Record

---

[150] *See supra* note 106.